## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

**GLENN D. SCOTT,**         )
    Plaintiff           )
                      )      Civil Action No. 2:20cv00040
v.                   )
                      )    __**REPORT AND RECOMMENDATION**__
**KILOLO KIJAKAZI,**[1]    )
**Acting Commissioner of**    )      By: PAMELA MEADE SARGENT
**Social Security,**        )      United States Magistrate Judge
    Defendant       )

### *I. Background and Standard of Review*

Plaintiff, Glenn D. Scott, ("Scott"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 1381 *et seq*. Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is, therefore, substituted for Andrew Saul as the defendant in this case.

514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Scott protectively filed his application for SSI on July 11, 2017, alleging disability as of July 11, 2017,[2] based on problems with his right leg and heart, depression and anxiety. (Record, ("R."), at 10, 206-10, 235, 269.) The claim was denied initially and on reconsideration. (R. at 99-101, 106-07, 109-11, 113-15.) Scott requested a hearing before an administrative law judge, ("ALJ"). (R. at 116-17.) A hearing was held on March 24, 2020, at which Scott was represented by counsel. (R. at 31-62.)

By decision dated April 21, 2020, the ALJ denied Scott's claim. (R. at 10-20.) The ALJ found Scott had not engaged in substantial gainful activity since July 11, 2017, the application date. (R. at 12.) The ALJ determined Scott had severe impairments, namely right leg fasciotomy;[3] anxiety; obsessive compulsive disorder, ("OCD"); depression; bipolar and related disorders; and substance use disorder, but he found Scott did not have an impairment or combination of impairments that met

---

[2] Scott initially alleged he became disabled as of October 24, 2006. (R. at 206.) However, at his hearing, he amended his alleged onset date to July 11, 2017. (R. at 40-41.)

[3] A fasciotomy surgery is a procedure to cut open the fascia, tissue beneath the skin, to relieve tension or pressure. *See* https://www.medicinenet.com/what_is_a_fasciotomy_surgery/article.htm (last visited Feb. 3, 2022).

or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14.) The ALJ found Scott had the residual functional capacity to perform sedentary[4] work, except he could lift and carry items weighing up to 10 pounds occasionally and less than 10 pounds frequently; he could sit up to six hours and stand and walk up to two hours each; he could push/pull as much as the lift/carry restrictions; he could occasionally climb, balance, stoop, kneel, crouch, crawl and work around unprotected heights, moving mechanical parts and hazardous machinery; he could perform simple, routine tasks with simple, short instructions and make simple work-related decisions, but could not perform assembly line work; and he could occasionally interact with supervisors, co-workers and the public. (R. at 14.) The ALJ found Scott had no past relevant work. (R. at 19.) Based on Scott's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Scott could perform, including the jobs of an addressing clerk, a stuffer and a circuit board touchup screener. (R. at 19-20.) Thus, the ALJ concluded Scott was not under a disability as defined by the Act and was not eligible for SSI benefits. (R. at 20.) *See* 20 C.F.R. § 416.920(g) (2020).

After the ALJ issued his decision, Scott pursued his administrative appeals, (R. at 328-30), but the Appeals Council denied his request for a review. (R. at 1-5.) Scott then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2020).

---

[4] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. § 416.967(a) (2020).

This case is before this court on Scott's motion for summary judgment filed June 16, 2021, and the Commissioner's motion for summary judgment filed July 15, 2021.

## II. Facts

Scott was born in 1973, (R. at 206), which classifies him as a "younger person" under 20 C.F.R. § 416.963(c). He has a high school education and no past relevant work experience. (R. at 39, 236.) Scott, through his counsel, claimed he had received social security disability benefits for many years, but his benefits were terminated for his failure to respond to paperwork.[5] (R. at 37.) Scott stated he had not had a driver's license for many years due to multiple driving under the influence, ("DUI"), convictions.[6] (R. at 39, 374.) He stated he took Suboxone instead of pain medication, and he occasionally used marijuana to boost his appetite. (R. at 54-55.)

Scott has a long-standing issue with his right leg, stemming from an unknown disorder in the early 2000s, which was treated with a fasciotomy. (R. at 332, 822.) However, Scott had already stopped working prior to the fasciotomy, and he reported that he was "doing odd jobs" and "just stopped working" in 1998. (R. at 235.) Scott reported he lived in an apartment above a restaurant owned by his mother, and he said he was unemployed, but would help "in the family restaurant occasionally." (R.

---

[5] At his hearing, Scott could not provide any specifics regarding when he received disability benefits or when his benefits were terminated. (R. at 37-39.) However, in November 2017, he reported an initial award of disability benefits in 2001, which were terminated in January 2017. (R. at 359-60.) Scott reported these benefits were terminated while he was incarcerated. (R. at 369, 376.) The record shows only unsuccessful prior disability applications. (R. at 64, 231-32.)

[6] Scott reported multiple charges, including prescription fraud; four DUIs; simple assault and battery; possession of a firearm; and at least 15 public intoxication charges. (R. at 361, 641.) He reported he was incarcerated for four years on federal charges for possession of a firearm. (R. at 367.)

at 376, 383-84.) Scott admitted to opening the restaurant daily and performing light work duties at the restaurant. (R. at 593.) He also stated he enjoyed hiking occasionally. (R. at 385.)

Mark Hileman, a vocational expert, also testified at Scott's hearing. (R. at 56-60.) Hileman testified that a hypothetical individual of Scott's age, education and work history, who could perform no more than occasional lifting and carrying of items weighing up to 10 pounds and less than 10 pounds frequently; sit up to six hours and stand and walk up to two hours each; occasionally climb, balance, stoop, kneel, crouch, crawl and work around unprotected heights and hazardous machinery; perform simple, routine tasks with simple, short instructions and make simple work-related decisions, but could not perform assembly line work; and occasionally interact with supervisors, co-workers and the public could perform a significant number of jobs that existed, including the jobs of an addressing clerk, consisting of 8,900 jobs nationally; a stuffer, consisting of 4,700 jobs nationally; and a printed circuit board touch-up screener, consisting of 9,500 jobs nationally. (R. at 56-57.) When asked to assume the same hypothetical individual, but who also would be off task 10 percent of the workday, in addition to normal breaks, Hileman testified the individual could perform the previously identified jobs. (R. at 57-58.) Hileman stated all work would be eliminated if the hypothetical individual would require extra supervision or could only occasionally use his upper extremities. (R. at 58-59.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. David Bristow, M.D., a state agency physician; Dr. Shaun Hines, D.O.; Stephen P. Saxby, Ph.D., a state agency psychologist; Dr. Jack Hutcheson, M.D., a state agency physician; Norton Community Hospital; Melinda M. Fields, Ph.D., a licensed psychologist;

Frontier Health; Wellmont Cardiology Services; Holston Valley Medical Center, ("Holston Valley"); Catalyst Health Solutions; Appalachia Family Health; and The Health Wagon.

In 2001, Scott had a blood clot in his right leg for which he underwent a fasciotomy to relieve the pressure.[7] (R. at 483.) He also was treated for aortic valve endocarditis and aortic regurgitation. (R. at 591-97.) In December 2014, an echocardiogram showed trace tricuspid regurgitation, trace aortic regurgitation and mild aortic root dilation. (R. at 630.)

On October 24, 2017, Scott presented to the emergency department at Holston Valley for depression related to family stressors and the death of a friend. (R. at 599-628.) Scott's heart had normal rate, regular rhythm and normal sounds, with no gallop, friction, rub or murmur; his musculoskeletal examination exhibited no edema or tenderness; he had normal coordination; his behavior, judgment and thought content were normal; he had a depressed mood; and he expressed no homicidal or suicidal ideations. (R. at 602.) Scott was diagnosed with major depressive disorder, single episode, unspecified; anxiety disorder, unspecified; panic disorder, episodic paroxysmal anxiety; cardiac murmur, unspecified; nicotine dependence, unspecified, uncomplicated; and drug therapy. (R. at 612.) Following discharge, Scott presented to Frontier Health for crisis intervention consultation and assessment. (R. at 421-31.) Scott requested help with substance abuse and help coming off Suboxone. (R. at 421.) He stated he felt depressed and did not want to

---

[7] On November 2, 2017, x-rays of Scott's right leg showed evidence of the prior surgery, as well as ossification and bony formation in the mid portion of the leg. (R. at 357.)

wake up to deal with withdrawal symptoms. (R. at 421.) Scott reported using opioids, marijuana and alcohol. (R. at 424.)

On mental examination, Scott had good attention and concentration; he appeared drab, but had a cooperative and appropriate mood and affect; he was talkative; his thought process was within normal limits; his judgment and impulse control were fair; and he had minimal insight. (R. at 427.) Crystal Burke, L.C.S.W., a licensed clinical social worker, diagnosed unspecified depressive disorder and moderate alcohol use disorder. (R. at 429.) Scott was admitted to aftercare at the Crisis Stabilization Unit from October 25, 2017, to October 30, 2017, where he was diagnosed with major depressive disorder and alcohol use disorder.[8] (R. at 434-45.) On October 31, 2017, Scott reported his medication was working, and he requested more Valium. (R. at 466.) On November 8, 2017, Scott reported he continued to drink and use Suboxone. (R. at 468.) He admitted to consuming alcohol prior to his appointment. (R. at 468.) Scott was well-groomed, calm and cooperative; he had fair eye contact; his musculoskeletal examination was within normal limits; he had normal speech; his thought process was circumstantial; his attention and concentration were fair; his insight was fair; his judgment was good; and his mood was sad/depressed. (R. at 470.) He was diagnosed with moderate alcohol use disorder; severe opioid use disorder; mild tobacco use disorder; and unspecified depressive disorder. (R. at 468.)

On November 30, 2017, Melinda M. Fields, Ph.D., a licensed psychologist, evaluated Scott at the request of Disability Determination Services. (R. at 359-64.) Scott stated he spent his time in his home watching television. (R. at 360.) He stated

---

[8] Scott continued aftercare, including group therapy, at the Crisis Stabilization Unit and was discharged on February 8, 2018. (R. at 466-80, 684-86.)

he was responsible for his own hygiene; he visited with family daily; he visited with friends at his apartment; he talked to and texted friends daily; he managed his finances without assistance; and he was not involved in church, civic or community activities. (R. at 360.) Scott described his social functioning as impaired due to nervousness. (R. at 360.) He stated he consumed alcohol daily, but was vague regarding use of prescription medication. (R. at 360-61.) Scott reported his most recent treatment was at a Suboxone clinic, but he had been out of treatment for a "few months." (R. at 361.) He reported taking Suboxone without a prescription with his most recent use occurring the day prior to Fields's evaluation. (R. at 361.)

On mental status examination, Scott presented as a poor historian and experienced difficulty remaining focused; eye contact was adequate; speech was rambling and mumbled; stream of thought was disorganized; thought content was void of preoccupations, obsessions or phobias; there was no evidence of hallucinations or delusions; his mood was anxious, and he displayed hand tremors; his affect was broad; his judgment was adequate; immediate memory was not impaired, but recent and remote memory were impaired; he had poor insight; concentration was impaired; and his persistence and pace were normal. (R. at 362.) Fields opined that social functioning during the exam was impacted by distractibility, need for redirection and repetition of questions, rambling and mumbled speech, anxious mood and hand tremors. (R. at 362.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Scott obtained a full-scale IQ score of 70. (R. at 362-63.) Fields diagnosed alcohol use disorder, opioid use disorder and unspecified anxiety disorder. (R. at 363.) Fields opined Scott likely would require significant supervision and support to complete tasks timely and appropriately. (R. at 363.) She deemed his prognosis as guarded with appropriate treatment and environmental support. (R. at 363.)

On February 10, 2018, Dr. Shaun Hines, D.O., examined Scott as part of his disability claim. (R. at 483-88.) Scott reported he had been on disability since 2001 due to his right leg and "was taken off last year due to not turning in some papers." (R. at 483.) Scott reported he was independent with his activities of daily living. (R. at 483.) Scott was in no acute distress; his cardiovascular examination was normal; his extremities had no edema, cyanosis or erythema, but he had some scarring and mild deformity of the right leg; he was alert and oriented; he was cooperative and was able to communicate without deficits; he did not appear depressed or anxious; his recent and remote memory were intact; he had good insight and cognitive function; he had good tone and strength, bilaterally, in all muscle groups; he had decreased grip strength on the right, which was suspected to be due to a fall from one week prior; he had adequate fine motor movements, dexterity and ability to grasp, bilaterally; he had a tremor in the right leg; he had intact sensation; his gait was antalgic; he was slow to rise from a sitting position without assistance; he was able to bend with moderate difficulty; he had no muscle asymmetry, atrophy or involuntary movements; and his straight leg raising tests were negative. (R. at 484-85.) Dr. Hines diagnosed injury from the right fasciotomy secondary to leg trauma. (R. at 485.)

Dr. Hines concluded Scott would "unlikely" be able to walk and/or stand for a full workday, and, if he were to choose, he "may be" able to sit for a partial workday with allotted occasional breaks. (R. at 485.) Dr. Hines added that Scott would be limited to lifting and carrying items weighing less than 10 pounds, and he should refrain from excessive bending, stooping and crouching. (R. at 485-86.)

On February 20, 2018, Scott presented to the emergency department at Norton Community Hospital for complaints of right rib pain and right leg pain after he fell

down some stairs. (R. at 500-05.) Scott admitted to daily alcohol consumption and stated he was not interested in referral for alcohol abuse. (R. at 500, 502.) He had a steady gait and full range of motion. (R. at 503.) X-rays of Scott's ribs and chest showed suspected nondisplaced fractures of the right sixth and seventh ribs. (R. at 493.) That same day, x-rays of Scott's right leg showed soft tissue fascial calcifications along the mid shaft of the fibula, compatible with a remote traumatic process. (R. at 494.) X-rays of Scott's right knee showed degenerative changes with no joint effusion. (R. at 495.) CT scans of Scott's head and cervical spine were normal. (R. at 496, 498.) Scott was diagnosed with a fall, alcohol intoxication and rib fractures. (R. at 501.)

On February 20, 2018, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding Scott was mildly limited in his ability to understand, remember or apply information; to interact with others and to adapt or manage himself; and moderately limited in his ability to concentrate, persist or maintain pace. (R. at 69-70.) Leizer also completed a mental assessment, finding Scott was moderately limited in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; and to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 73-75.) He opined Scott had no social interaction limitations and no adaptation limitations. (R. at 74-74.) He also opined Scott could follow simple instructions and complete simple and routine tasks. (R. at 74-75.) Leizer stated Scott's work-related mental abilities were, otherwise, not significantly limited. (R. at 74.)

On February 20, 2018, Dr. David Bristow, M.D., a state agency physician, found Scott could lift and carry items weighing up to 10 pounds occasionally and less than 10 pounds frequently; sit up to six hours and stand and/or walk up to four hours; push/pull as much as the lift/carry restrictions; frequently climb ramps and stairs, stoop, kneel, crouch and crawl; occasionally climb ladders, ropes and scaffolds and balance; and he should avoid moderate exposure to work hazards, such as machinery and heights. (R. at 71-73.) Dr. Bristow indicated no manipulative, visual or communicative limitations. (R. at 72.)

On June 7, 2018, Scott was admitted to Norton Community Hospital for complaints of chest pain, nausea and vomiting. (R. at 513, 515-23, 561-63.) Scott stated he last consumed one-fifth of vodka two days prior. (R. at 513.) He admitted to obtaining Suboxone, Percocet, Adderall and cannabis "off the streets," and he frequently injected Suboxone. (R. at 513.) Scott denied depression, suicidal or homicidal ideations, anxiety and hallucinations. (R. at 516.) He had a steady gait and full range of motion. (R. at 559) Chest x-rays showed chronic obstructive pulmonary disorder, ("COPD"), without acute cardiopulmonary process. (R. at 553.) A CT scan of Scott's abdomen and pelvis showed a fatty enlarged liver. (R. at 554-55.) An electrocardiogram, ("ECG"), showed sinus tachycardia and abnormal rhythm. (R. at 556.) Scott was discharged the next day with a diagnosis of acute alcohol withdrawal; elevated lipase; history of drug abuse; and a urinary tract infection. (R. at 512.)

On November 8, 2018, Stephen P. Saxby, Ph.D., a state agency psychologist, completed a PRTF, finding Scott was mildly limited in his ability to interact with others and to adapt or manage himself and moderately limited in his ability to understand, remember or apply information and to concentrate, persist or maintain

pace. (R. at 87-88.) Saxby also completed a mental assessment, finding Scott was moderately limited in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; and to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 92-93.) He opined Scott had no social interaction limitations and no adaptation limitations. (R. at 93.) He also opined Scott could follow simple instructions and complete simple and routine tasks. (R. at 93.) Saxby stated Scott's work-related mental abilities were, otherwise, not significantly limited. (R. at 92-93.)

On November 12, 2018, Dr. Jack Hutcheson, M.D., a state agency physician, found Scott could lift and carry items weighing up to 10 pounds occasionally and less than 10 pounds frequently; sit up to six hours and stand and/or walk up to four hours; push/pull as much as the lift/carry restrictions; frequently climb ramps and stairs, stoop, kneel, crouch and crawl; occasionally climb ladders, ropes and scaffolds and balance; and he should avoid moderate exposure to work hazards, such as machinery and heights. (R. at 90-92.) Dr. Hutcheson indicated no manipulative, visual or communicative limitations. (R. at 91.)

On February 13, 2019, Scott established behavioral health services at Appalachia Family Health for complaints of anxiety and various stressors. (R. at 641-43.) Scott reported problems with substance use, stating he took "too many" Oxycontin for pain and used marijuana for his "nerves" and to increase his appetite. (R. at 641.) He also stated he took Suboxone on occasion, Klonopin and other benzodiazepines. (R. at 641.) Burke reported Scott was clean and neat; he had a mildly anxious mood and anxious affect; he had minimal eye contact; his thought

process was scattered; he was evasive at times; he had no paranoia or delusions; and his judgment and insight were fair. (R. at 642.) Burke diagnosed psychoactive substance abuse, uncomplicated; anxiety disorder, unspecified; and depressive episodes. (R. at 642.)

On March 5, 2019, Scott saw Ava Martin, a board-certified psychiatric mental health nurse practitioner, with Appalachia Family Health, stating he was referred by his attorney because he was "trying to get my disability." (R. at 648-57.) Scott reported he had problems with "nerves" and anxiety. (R. at 648.) He reported he used Klonopin and Neurontin, in addition to Suboxone, which he obtained from his brother. (R. at 648.) Scott reported he consumed wine coolers and vodka and used marijuana daily. (R. at 649.) He denied chest pain; shortness of breath; swelling in his ankles; palpitations; cyanosis; back and neck pain; sciatica; joint pain, stiffness and limitation of movement; and muscle pain and weakness.[9] (R. at 652.) Scott had fair judgment and insight; his recent and remote memory were intact; he had a euthymic mood and congruent affect; his breath smelled of alcohol; his thought process was intact; he had no paranoia or delusions; he was fidgety; his motor movements were unremarkable; and his speech was tangential. (R. at 653-55.) On March 18, 2019, Scott reported family and life stressors. (R. at 644.) Scott was clean and neat; his mood and affect were anxious; he made adequate eye contact; his thought process was scattered; he had no paranoia or delusions; and his judgment and insight were fair. (R. at 646.)

---

[9] Scott denied these symptoms at each office visit. (R. at 669-70, 676-77, 692-93, 828, 858-59.)

On April 16, 2019, Martin reported Scott smelled strongly of alcohol, and he admitted he had been drinking. (R. at 671.) He stated, "I just want to relax and be away from aggravation." (R. at 671.) Scott reported that he and his girlfriend laid in bed and watched television. (R. at 671.) Scott had a euthymic mood and congruent affect; his eye contact was fair; his thought process was intact; he had no paranoia or delusions; his judgment and insight were fair; he was calm and cooperative; his motor movements were unremarkable; his speech was tangential; and he had good articulation. (R. at 671.) A urine drug screen was positive for alcohol, THC and Suboxone and negative for Celexa, trazodone and Seroquel. (R. at 672.) On May 28, 2019, Scott smelled of alcohol. (R. at 674.) His examination remained unchanged, except his grooming was described as disheveled. (R. at 678.)

Scott was seen at Catalyst Health Solutions from April 2019 through March 2020 for addiction treatment and counseling.[10] During this time, Scott was stable; he was fully oriented and well-groomed with good hygiene; he had a euthymic mood and full affect; he had normal perceptions and cognition; he had no motor deficits; his judgment and insight were good; and he had no suicidal or homicidal ideations. (R. at 698, 700, 702, 704, 706, 708, 710, 712-13, 715, 717, 719, 721, 725, 727, 729, 731, 733, 735, 763, 832, 834, 836, 838, 845, 847, 863, 865, 867.) In May 2019, Scott reported his mother[11] "ran out [of Suboxone] early" and he gave her his because he felt she needed it. (R. at 731.) Dr. Gregory Vines, M.D., noted Scott's history of selling Suboxone, and Scott was encouraged to avoid illegal activity. (R. at 731.) On

---

[10] During this time, Scott's urine drug screens were positive for buprenorphine and marijuana. (R. at 781-83, 790-96, 800-08, 815, 855, 872.) In September and October 2019, in addition to being positive for buprenorphine and marijuana, Scott's urine drug screens were positive for methamphetamine and amphetamine. (R. at 702, 784, 788-89.) Scott denied using methamphetamine. (R. at 704.)

[11] The record indicates Scott's mother was diagnosed with breast cancer. (R. at 706.)

June 14, 2019, Scott was intoxicated on alcohol and was unable to stay awake for his appointment. (R. at 723.) On June 26, 2019, Scott denied alcohol use, but was "stumbling." (R. at 719.) Dr. Vines noted that Scott "appears to have a problem with [alcohol] and [he] is in denial." (R. at 719.) On June 28, 2019, Dr. Vines noted Scott was too intoxicated to receive his prescription. (R. at 717.) Dr. Vines recommended alcohol treatment. (R. at 718.) On September 27, 2019, Dr. Vines encouraged Scott to obtain employment rather than to seek disability benefits. (R. at 703.)

On October 15, 2019, Scott saw Martin and reported depression, anxiety and insomnia. (R. at 693.) Scott was clean, neat and well-groomed; he smelled strongly of alcohol; he was fully oriented; he had a euthymic mood and congruent affect; his eye contact was fair; his thought process was intact; his judgment and insight were fair; he was calm and cooperative; his motor movements were unremarkable; his speech was normal; he had good articulation; and he had no suicidal or homicidal ideations.[12] (R. at 694-95.)

On October 25, 2019, Erika Fugere, L.M.S.W., a licensed master social worker with Catalyst Health Solutions, reported Scott got a "little spooked" when asked how he financially supported himself, and he evaded the questions several times. (R. at 763.) On November 19, 2019, Scott saw Ramona Boyd, N.P., a nurse practitioner with The Health Wagon, and reported anxiety, depression and pain and numbness in his right lower extremity. (R. at 822.) He denied chest pain; shortness of breath; irregular heartbeat; palpitations; joint pain, swelling and stiffness; and muscle aches and weakness. (R. at 822.) Scott admitted to substance abuse. (R. at 822.) He was appropriately dressed; he appeared anxious and restless; he had a grade

---

[12] Scott's examination findings remained unchanged at his December 2019 and January 2020 office visits. (R. at 829-30, 860-61.)

4/6 heart murmur; he had non-focal motor strength; his upper and lower extremities were normal; he had intact sensation; and he was fully oriented. (R. at 823.) Boyd diagnosed accelerated hypertension; substance abuse; neuropathy; pain; anxiety and depression; endocarditis and heart valve disorders; and systolic murmur. (R. at 823.)

On January 10, 2020, Dr. Vines again recommended Scott obtain employment rather than seek disability benefits. (R. at 845.) Dr. Vines noted Scott was focused on pursuing disability benefits and was not open to working. (R. at 845.) On January 24, 2020, Scott reported his anxiety and depression "comes and goes" and he was handling stress "okay." (R. at 847.) On March 11, 2020, Scott admitted to Paula Hill, a board-certified family nurse practitioner with The Health Wagon, to consuming alcohol two to three times a week, as well as substance abuse. (R. at 873-74.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2020). *See also Heckler v. Campbell,* 461 U.S. 458, 460-62 (1983); *Hall v. Harris,* 658 F. 2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the

claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano,* 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers,* 131 F.3d 438, 439-40 (4th Cir. 1997).

Scott argues the ALJ erred by finding a significant number of jobs existed that he could perform. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.) Scott also argues the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Brief at 5-6.) Scott contends the ALJ erred in his consideration of the evidence, particularly, the opinions of Fields and Dr. Hines. (Plaintiff's Brief at 5-6.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the

record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 416.920c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[13]

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 416.920c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 416.920c(b)(1) (2020).

---

[13] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 416.913(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 416.913(a)(5) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 416.920c(b)(2) (2020).[14] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 416.920c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. § 416.920c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 416.920c(b)(2)-(3) (2020).

---

[14] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 416.920c(c)(2).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 416.920c(b)(3), (c)(3)-(5).

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 416.945(a) (2020). The ALJ found Scott had the residual functional capacity to perform sedentary work, except he could lift and carry items weighing up to 10 pounds occasionally and less than 10 pounds frequently; he could sit up to six hours, stand and walk up to two hours each; he could push/pull as much as the lift/carry restrictions; he could occasionally climb, balance, stoop, kneel, crouch and crawl; he could occasionally work around unprotected heights, moving mechanical parts and hazardous machinery; he could perform simple, routine tasks with simple, short instructions and make simple work-related decisions, but could not perform assembly line work; and he could occasionally interact with supervisors, co-workers and the public. (R. at 14.)

In making this residual functional capacity finding, the ALJ noted the general lack of any treatment evidence regarding Scott's physical impairments.[15] (R. at 18.) The ALJ focused on Dr. Hines's consultative examination and the findings of the state agency physicians. (R. at 18.) Dr. Hines found that Scott was in no acute

---

[15] The record consists of evidence primarily related to Scott's substance addiction. The ALJ found Scott's substance abuse was not material to the determination of disability because Scott, even with substance abuse disorder, was not found to be disabled. (R. at 19.)

distress; his cardiovascular examination was normal; his extremities had no edema, cyanosis or erythema; he had good tone and strength, bilaterally, in all muscle groups; he had intact sensation; his gait was antalgic; he was slow to rise from a sitting position without assistance; he was able to bend with moderate difficulty; he had no muscle asymmetry, atrophy or involuntary movements; and his straight leg raising tests were negative. (R. at 484-85.) Dr. Hines concluded Scott would "unlikely" be able to walk and/or stand for a full workday, and, if he were to choose, he "may be" able to sit for a partial workday with allotted occasional breaks. (R. at 485.) Dr. Hines added that Scott would be limited to lifting and carrying items weighing less than 10 pounds, and he should refrain from excessive bending, stooping and crouching. (R. at 485-86.) While Dr. Hines did not offer specifics regarding how many hours Scott could sit or stand during a workday, and similarly noted that he "may" have exacerbations when lifting items weighing more than 10 pounds, the ALJ found that limiting Scott to sedentary work was supported by the record and consistent with Dr. Hines's physical examination findings. (R. at 18.)

As noted by the ALJ, state agency physician Dr. Bristow opined Scott could lift and carry items weighing up to 10 pounds occasionally and less than 10 pounds frequently; sit up to six hours and/or stand and walk up to four hours; push/pull as much as the lift/carry restrictions; frequently climb ramps and stairs, stoop, kneel, crouch and crawl; occasionally climb ladders, ropes and scaffolds and balance; and he should avoid moderate exposure to work hazards, such as machinery and heights. (R. at 18, 71-73.) The ALJ found this opinion was "consistent" with Dr. Hines's consultative examination. (R. at 18.) The ALJ also noted that state agency physician Dr. Hutcheson affirmed Dr. Bristow's opinion, and, therefore, his opinion had the same "persuasive value." (R. at 18.)

In February 2018, Scott sought treatment for right leg pain following a fall, at which time he had intact strength and range of motion, despite tenderness in his right leg. (R. at 500-05.) The record lacks additional evidence that Scott sought treatment for leg pain. In fact, Scott's physical examinations showed his heart had normal rate, regular rhythm and normal sounds with no gallop, friction, rub or murmur; his musculoskeletal examination exhibited no edema or tenderness; he had normal coordination; he had good tone and strength, bilaterally, in all muscle groups; he had a tremor in the right leg; he had intact sensation; he had no muscle asymmetry, atrophy or involuntary movements; his straight leg raising tests were negative; and he had full range of motion. (R. at 470, 484-85, 559, 602, 671, 823.) In February 2018, x-rays of Scott's right leg showed soft tissue fascial calcifications along the mid shaft of the fibula, compatible with a remote traumatic process. (R. at 494.) X-rays of Scott's right knee showed degenerative changes with no joint effusion. (R. at 495.) In addition, Scott routinely denied chest pain; shortness of breath; swelling in his ankles; palpitations; cyanosis; back and neck pain; sciatica; joint pain, stiffness and limitation of movement; and muscle pain and weakness. (R. at 652, 669-70, 676-77, 692-93, 828, 858-59.) Scott was independent with his activities of daily living. (R. at 483.) Furthermore, Dr. Vines encouraged Scott to obtain employment rather than to seek disability benefits. (R. at 703, 845.)

The ALJ found Fields's November 2017 opinion had "little persuasive value" because the record failed to support her finding that Scott would require significant supervision. (R. at 17.) As the ALJ explained, Scott consistently had unremarkable mental status examinations during his treatment. (R. at 16.)  Indeed, he consistently presented as well-groomed with a euthymic mood, normal perceptions and cognition and good judgment and insight. (R. at 698, 700, 702, 704, 706, 708, 712, 715, 719, 721, 725, 832, 834, 836, 838, 843, 845, 863, 865, 867.) In addition, Scott was

cooperative, fully oriented, was able to communicate without deficits, and his recent and remote memory were intact. (R. at 484, 653, 671, 695.) The ALJ also noted Scott reported engaging in activities with meaningful mental demands, such as preparing meals, performing household chores and socializing with friends. (R. at 15, 17, 360.)

The ALJ found state agency psychologist Saxby's opinion was consistent with the record, which supported no more than moderate limitations in concentrating, persisting or maintaining pace. (R. at 17-18, 88.) However, the ALJ found Leizer's opinion "not persuasive" as it related to the mild limitations in understanding, remembering or applying information and in the ability to interact with others because Scott exhibited impaired memory during Fields's consultative evaluation. (R. at 18, 69, 362.) In addition, the ALJ noted Scott's mental health records showed irritability and reports of panic attack and social anxiety, thus, supporting greater limitations. (R. at 18.) Therefore, the ALJ found Scott could perform simple, routine tasks with simple, short instructions and simple work-related decisions; and he could have no more than occasional interaction with supervisors, co-workers and the public. (R. at 14.)

Scott also argues the ALJ erred by finding a substantial number of jobs existed that he could perform. (Plaintiff's Brief at 4-5.) The ALJ posed a hypothetical question to the vocational expert which encompassed the ALJ's ultimate residual functional capacity finding. (R. at 14, 56-57.) The vocational expert testified that such an individual could perform jobs existing in significant numbers in the national economy. (R. at 57.) It is well-settled that the testimony of a vocational expert constitutes substantial evidence for purposes of judicial review where his opinion is based on a consideration of all the evidence of record and is in response to a proper hypothetical question which fairly set out all a claimant's impairments. *See Walker*

*v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The vocational expert identified the jobs of an addressing clerk as having 8,900 jobs nationally; a stuffer as having 4,700 jobs nationally; and a printed circuit board touch-up screener as having 9,500 jobs nationally. (R. at 57.) The Fourth Circuit has suggested in dicta that 110 jobs in the local economy would not constitute an insignificant number of jobs. *See Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979); *see also Hodges v. Apfel*, 2000 WL 121251, at *1 (4th Cir. Jan. 28, 2000) (holding that 153 regional jobs "suffice[d] to defeat [the claimant's] claim for disability benefits"). Consistent with this, district courts within the Fourth Circuit have indicated that as few as 3,000 jobs in the national economy could qualify as significant. *See Aquino-Hernandez v. Saul*, 2020 WL 4678823, at *5 (D. S.C. Mar. 11, 2020) (finding 3,000 jobs to qualify as a significant number of jobs in the national economy). Thus, I find that the ALJ's finding that Scott could perform a significant number of jobs is supported by substantial evidence.

Based on this, I find that substantial evidence exists to support the ALJ's consideration of the opinion evidence and his residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding;

3. Substantial evidence exists to support the ALJ's finding that a significant number of jobs existed that Scott could perform; and

4. Substantial evidence exists in the record to support the Commissioner's finding that Scott was not disabled under the Act and was not entitled to SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Scott's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioners decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      February 4, 2022.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE